**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **STORED SOLAR ENTERPRISES,** | ) | **Chapter 11** |
| **SERIES LLC** | ) | **Case No. 22-10191** |
| | ) | |
| **Debtor.** | ) | |

**OBJECTION TO DISCLOSURE STATEMENT WITH RESPECT TO**
**CHAPTER 11 PLAN DATED AUGUST 18, 2023**

Now comes Marcus | Clegg ("MC"), an administrative creditor of the Debtor, and

objects to the Disclosure Statement with Respect to Chapter 11 Plan Dated August 18,

2023 (the "Disclosure Statement") [D.E. # 441] filed by the Plan proponents in this case,

the Chapter 11 Trustee and the Official Committee of Unsecured Creditors (hereinafter

referred to as the "Trustee" and the "Committee" and together the "Plan Proponents"). MC

respectfully requests that this Court deny approval of the Disclosure Statement because it

does not provide creditors with adequate information to accept or reject the plan [D.E. #

439] (the "Plan") filed by the Plan Proponents. To the extent that the Disclosure Statement

provides information, it shows that the Plan filed by the Plan Proponents cannot be

confirmed and this case should be converted to a case under Chapter 7 of the Bankruptcy

Code.

Section 1125(b) of Title 11 of the United States Code (the "Bankruptcy Code")

provides that acceptance or rejection of a proposed plan may not be solicited unless the

holder of a claim or interest to whom the solicitation is made is provided with the proposed

plan or summary thereof "and a written disclosure statement approved, after notice and

hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). The

1

Bankruptcy Code further defines "adequate information" as information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the holders of claims and interests in the case to make an informed judgment about the plan. 11 U.S.C. § 1125(a)(1).

To meet the adequate information standard, a disclosure statement must clearly and succinctly inform creditors what they are going to get, when they are going to get it, and what contingencies there are to getting distributions, including the requirement that current and projected administrative and priority expenses must be paid before unsecured creditors can get any distribution, and the impact of that requirement in this case. *In re Oxford Homes, Inc.*, 204 B.R. 264, 269 (Bankr. D.Me. 1997); *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991) (listing eighteen (18) types of information that should be included). The Disclosure Statement (and the Plan) fail to do so.

A.   **The Disclosure Statement Fails to Adequately Disclose the Amount of Administrative and Priority Claims, How Such Claims Will be Satisfied on the Effective Date of the Plan, and the Impact of Such Claims on Distribution to Creditors.**

Under Section 1129(a)(9) of the Bankruptcy Code, administrative and priority claims are required to be paid on confirmation of the Plan or on the Effective Date of the Plan. Here, the Effective Date of the Plan is defined as the 30th business day after Plan confirmation.

According to the official Claims Register in this case, there are filed secured claims totaling $175,580.37, filed priority claims totaling $653,744.00 and filed administrative claims totaling 872,862.53. These claims total $1,702,186.37. The Disclosure Statement falls woefully short of showing that the Plan can be confirmed in the face of these claims. To the extent that the priority and administrative claims, totaling $1,526,606, are allowed claims (and as filed proofs of claim they are entitled to *prima facie* allowance), they are

2

entitled to be paid in full on the Effective Date of the Plan, under Section 1129(a) of the

Bankruptcy Code.   The Debtor's cash on hand available to satisfy administrative and

priority claims [1] as of the end of August, was $274,893 (and $0.00 accounts receivable).

*See* August 2023 Monthly Operating Report [D.E.# 453]. Moreover, a review of the 2023

Operating Reports as whole show a constant downward trend in cash available to make

payments required to be made on the Effective Date of the Plan:

| *Month* | *Starting Balance* | *Ending Balance* |
|---------|--------------------|--------------------|
| January | 464,940 | 465,240 |
| February | 465,240 | 429,870 |
| March | 429,870 | 294,631 |
| April | 294,631 | 282,025 |
| May | 282,025 | 279,338 |
| June | 279,338 | 275,133 |
| July | 275,133 | 353,445 |
| August | 353,445 | 274,893 |

This consistent erosion of cash needed to satisfy administrative and priority claims under

the Plan is of concern, not only because it shows that cash is dramatically inadequate for

Plan purposes, but in addition, one can only expect the decline in the Debtor's cash

balances to continue. This insolvency of the Debtor, as it currently exist and as it may

worsen, must be addressed in the Disclosure Statement.

The Disclosure Statement provides very little in the way of substantive explanation

as to why this administrative/priority claim insolvency is not a deal breaker for the Plan,

only stating vaguely that the Plan Proponents believe the Debtor, as a pass-through entity,

will  not ultimately be liable for the tax-based administrative claims and promising to work

---

[1]      The $650,000 GUC Reserve is not initially available to satisfy administrative claims.  As set
forth below, additional information is needed in order to be able to determine whether the GUC
Reserve is available to pay any portion of administrative claims. Even if it is, however, the record still
suggests administrative insolvency with no plan to deal with it.

out agreements with the taxing authorities or, failing that, to object to the claims. Disclosure Statement, p. 9 Notably absent from the Disclosure Statement is any claim-by-claim analysis of the administrative and priority claims, nor any estimate of how much, if any, the Trustee anticipates having to pay as to each. In this regard, reference should be made to the Objection to Plan Confirmation filed by Maine Revenue Services ("MRS") on September 18, 2023 [D.E. #452]. In that objection MRS, which asserts an administrative claim against the Debtor of $267,998.90, notes that principals of the Debtor may or may not be responsible for payment of all or a portion of that claim. As MRS points out, whether the Debtor can pass its liability to MRS through to its members is an open question, which has not been resolved. The Disclosure Statement addresses none of this, nor any other tax administrative claim, other than the bald assertion that "The Plan Proponents believe that the Debtor is a pass-through entity" (Disclosure Statement, p. 8). Maine Revenue Services thinks otherwise, and its administrative claim will absorb $267,998 of the Debtor's available cash, leaving virtually nothing for satisfaction of other administrative and priority claims. In any event, the Disclosure Statement entirely fails to refute liability for the MRS claim, or any other administrative claims and priority claims in excess of the Debtor's cash resources.

Further, any such disclosure should also include estimates for Professional Fees Claim and any other administrative claims the Plan Proponents expect will be filed by the Postpetition Bar Date (as that term is defined in the Plan). The Disclosure Statement says nothing about the expected amount of these administrative claims, nor the availability of any cash to pay them, particularly in light of administrative claims filed by other parties.

4

While it may be the case that the Trustee and Committee professionals may be able to use previously established carve outs to satisfy their administrative claims, that does not change the reality that even apart from the administrative claims of estate professionals, which are not included in the $1,526,606 balance of other administrative and priority claims, the Debtor lacks sufficient cash resources to pay administrative and priority claims. Given this reality, the possibility that future administrative claims may be filed by the Postpetition Bar Date, the Disclosure Statement cannot be approved because it fails to disclose adequate information regarding the ability of the Plan Proponents or the Debtor to satisfy administrative and priority claims on the Effective Date of the Plan, which is required in order to have a confirmable Plan.  This disclosure failure is highly material and significant:  It is highly likely that the resources of the Debtor will be insufficient to pay administrative and priority claims on the Effective Date or later and therefore it is highly unlikely that the Plan can be confirmed, leaving the amount available to pay to unsecured creditors very much in doubt.

And while there is a $650,000 "GUC Sale Reserve" intended for unsecured creditors, it is not clear that this money can be carved out and preserved for unsecured creditors under *In re SPM Manuf. Corp.,* 984 F.2d 1305 (1st Cir. 1993) if creditors higher up the priority food chain have not been satisfied.  In the SPM case, the First Circuit held that while a secured creditor in a bankruptcy case, after its receipt of proper distributions in accordance with the Bankruptcy Code, is free to share those funds so received with unsecured creditors—even if priority creditors are unpaid—the secured and unsecured creditors are not free, by stipulation or agreement, to vary the distribution rules of the Bankruptcy Code and cause assets to bypass payment of priority claims where the assets

were never transferred to the secured creditor in the first instance. SPM casts substantial

doubt on the validity and enforceability of the GUC Sale Reserve, where there will be

substantial unpaid administrative and priority claims and those funds appear to have never

been in Hartree's possession as required by *SPM*.

The Plan in this case contemplates a Liquidating Trust for the benefit of unsecured

creditors. The Liquidating Trust will be funded by "the cash included in the Assets[2] as well

as the GUC Sale Reserve." Liquidating Trust Agreement ("LTA"), pp. 1, 4. As discussed

above, it appears there will be no "cash included in the Assets" left after payment of

administrative and priority creditors and the availability to of the GUC Sale Reserve to

satisfy unsecured claims where there are unpaid administrative and priority claims is in

substantial doubt.   To add even more uncertainty, if there is anything left of the GUC Sale

Reserve after satisfaction of administrative and priority claim—a doubtful outcome—the

Plan Proponents propose to further dissipate it by using it to fund litigation for the benefit

of holders of allowed unsecured claims. LTA §§ 3.2, 3.11 ("The Liquidating Trustee shall

be paid reasonable compensation from the Assets for his or her service to the Trust"). Does

this mean that the Liquidating Trustee will be allowed to eat into the GUC Sale Reserve

(or whatever is left of it) to fund the ill-advised litigation suggested in the Plan and the

Disclosure Statement? If so, it should be made manifestly clear to creditors, priority,

administrative and unsecured, that funds now potentially available for distribution would

---

[2]      Assets is defined as "each and every item of property and interest of the Debtor it its Estate
as of the Effective Date, whether tangible or intangible, legal or equitable, liquidated or unliquidated,
and includes, without limitation, (i) all Cash; (ii) all rights in and proceeds of Insurance Policies
applicable [sic] the Debtor not otherwise assigned to the Buyer, and (iii) any other rights, privileges,
deferred taxes, Claims Causes of Action, or defenses of the Debtor and its Estate, whether arising by
statute or common law, and whether arising under the laws of the United States, other countries, or
applicable state or local law. For avoidance of doubt, Assets do not include any real or personal
property conveyed to the Buyer as part of the Sale Transaction."

be expended to pursue highly dubious claims. Of course, this decision should not be left in

the hands of the Plan Proponents, who, as will be discussed below, have their own stake in

the matter; rather a neutral Chapter 7 Trustee should be put in place to address these issues.

**B.    The Disclosure Statement Fails to Make Adequate Disclosure Regarding
Alleged Breach of Fiduciary Claims Against Officers and Counsel for the
Debtor.**

The Plan Proponents no doubt recognized the tremendous shortfall in cash to

satisfy, on confirmation or the Effective Date or at any time thereafter, allowed

administrative and priority claims, much less provide a dividend to unsecured creditors

above and beyond the $650,000 GUC Reserve (if that is available for unsecured creditors

at all, per discussion above) The response of the Plan Proponents to the evident shortfall

and estate insolvency is the functional equivalent of a "Hail Mary" pass:  allege that the

Debtor's officers and attorneys breached their fiduciary duties and that somehow those

allegations will produce sufficient cash by the Effective Date to satisfy claims that cannot

be covered by the estate's current assets. The Disclosure Statement, however, offers

nothing by way of substance as to what these claims are, the likelihood of success, the

alleged damages, when they might be recovered, or the cost of pursuing the claims. There

are no details; no analysis; no justification or support. There is hardly any information,

much less "adequate information," in the Disclosure Statement from which a creditor could

make an informed decision about these claims in the context of the Plan, and the extent to

which funds now available for distribution should be expended in pursuit of what appear

to be meritless claims. *See e.g., Ferretti,* 128 B.R. at 19 (appropriate information for

inclusion in a disclosure statement includes the "actual or projected value that can be

7

obtained from avoidable transfers" and the "existence, likelihood and possible success of nonbankruptcy litigation").

The lack of details or, indeed, any analysis of these alleged claims is likely a function of the fact that they are demonstrably not meritorious. The law regarding fiduciary duties of officers and others to Chapter 11 debtors has been revisited recently in an opinion of the Delaware Bankruptcy Court entered on August 31, 2023, *In re: FURNITURE FACTORY ULTIMATE HOLDING, L.P., Debtor. STEVEN BALASIANO, NOT INDIVIDUALLY BUT SOLELY IN HIS CAPACITY AS TRUSTEE OF THE LIQUIDATION TRUST OF FURNITURE FACTORY ULTIMATE HOLDING, L.P., et al., Pl., v. JONATHAN H. BORELL, et al., Defendants.* No. 20-12816 (JKS), 2023 WL 5662747 (Bankr. D. Del. Aug. 31, 2023.) (A copy of is attached hereto as **Exhibit A** for the Court's convenience). As noted by the Delaware Bankruptcy Court, a claim for breach of fiduciary duty must be premised on either a breach of the duty of care or a breach of the duty of loyalty. Id. at *11. The duty of care "requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent men would use in similar circumstances; and (2) consider all material information reasonably available." *Id.* at * 12 (citations omitted).  Further, *"[D]uty of care violations are actionable only if the directors acted with gross negligence, which is rarely found. Gross negligence is 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'" Id.* (Emphasis added; quotations omitted).  Here, the Disclosure Statement fails to describe any conduct, facts or circumstances that would or even could constitute a breach of the

8

fiduciary duty of care, nor any conduct or circumstances that would support a finding of "gross negligence" by either the Debtor's management or its counsel.[3]

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholders and not shared by the stockholders generally." *Id.* (citations omitted). As with the purported violations of the duty of care, the Disclosure Statement fails to describe any conduct, facts or circumstances that might constitute a breach of the fiduciary duty of loyalty. It would be virtually impossible for any creditor to make any informed decision as to whether to support the Plan, which contemplates the expenditure

---

[3]    Ironically, the Creditors Committee, the Trustee, and their respective counsel have tried to protect themselves from any liability for their actions in the case. The Plan in Article 9, Section 9.3, contains broad exoneration and exculpation of the Committee, the Trustee and counsel from "any and all claims, causes of action, and other assertions of liability (including, without limitation, breach of fiduciary duty), arising out of or related to the Case". It is noteworthy that MRS has  asserted in its recently filed Objection that "MRS understands that if approved, this [Plan] provision [exculpation of the Committee, the Trustee and counsel] would release parties against whom MRS may have direct claims for failure to remit Maine tax pursuant to 36 M.R.S.A. §5250."MRS further states: "MRS does not consent to release any "Exculpated Parties" who may be a responsible party for the unpaid tax under Maine state law". The potential liability of the Committee, the Trustee and their counsel has three important ramifications:  First, the Plan Proponents, the Trustee and the Committee and their counsel, in proposing exculpation, have a direct conflict of interest with general unsecured creditors who would gain advantage by having other parties, particularly those with fiduciary duties to them, responsible for unpaid taxes, as is claimed by MRS. Second, it makes confirmation of the Plan proposed by the Committee and the Trustee impossible because of their conflict of interest in seeking exoneration. Finally, if there is any remaining viability of the Plan, the Disclosure Statement is entirely inadequate by its failure to disclose the potential liability of the Committee, the Trustee and their counsel to the State of Maine, and the conflict of interest that that creates.

And the foregoing is not the only conflict of interest for the Committee and its counsel.  To the extent that any claim for breach of fiduciary duty is made against the Debtor's principals and counsel for alleged missteps during administration of the estate, one is hard-pressed to see why the Plan Proponent's (murky and undeveloped) theory of liability would not apply to the members of the Committee and their professionals as well, given that they were actively involved in all aspects of administration of the estate, essentially from the beginning to the end;  indeed, the docket of the case shows that the Committee eventually wound up in control of the case.  Members of the Committee and counsel are not immune from liability for breaches of fiduciary duty, and the provisions of the Plan which propose to grant such immunity present a serious conflict of interest for the Committee and its counsel with respect to the interests of creditors.

of funds otherwise available for distribution to pursue these alleged claims, based on the complete absence of information in the Disclosure Statement regarding the *bona fides* of the same.

In short, the allegations in the Disclosure Statement concerning breach of fiduciary duties by those who owe such duties to the Debtor (including the lack of Disclosure of potential liability of the members of the Creditors' Committee and counsel to MRS and possibly others), are little more than a transparent, and entirely unsupported, effort to distract attention from and compensate for the obvious lack of resources needed to confirm the Plan, i.e. the inability, on the Effective Date of the Plan, to pay administrative and priority claims. Without disclosure of the existence of these administrative and priority claims, the extent to which they will be allowed or rejected, the means by which they will be satisfied if allowed, and whether there can be confirmation of the Plan and a distribution to unsecured creditors, the Disclosure Statement falls woefully short of providing "adequate information" and it cannot be approved.

## **Conclusion**

For the foregoing reasons, the Debtor respectfully requests that this Court enter an order:

A.    Finding that service of this Objection is adequate service of process under the circumstances of this case;

B.    Disallowing the Disclosure Statement because it fails to provide adequate information with respect to the Plan; and

C.    Granting such other and further relief as the Court deems just and proper.

DATED:  September 21, 2023            /s/ George J. Marcus
                                      George J. Marcus, Esq.
                                      David C. Johnson, Esq.
                                      John H. Doyle, Esq.

                                      MARCUS | CLEGG
                                      16 Middle Street, 5th Floor
                                      Portland, ME  04101
                                      (207) 828-8000
                                      bankruptcy@marcusclegg.com